**[NOT SCHEDULED FOR ORAL ARGUMENT]**

**No. 22-7057**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

APPRIO, INC.,

*Plaintiff, Counter-Defendant, Appellee*,

v.

NEIL ZACCARI,

*Defendant, Counter-Claimant, Appellant.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:18-cv-02180-JDB
Hon. John D. Bates, United States District Judge

_____

**APPELLANT'S BRIEF**

_____

Belinda D. Jones
CHRISTIAN & BARTON LLP
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
(804) 697-4159
BJones@CBLaw.com

Robert D. Michaux
CHRISTIAN & BARTON LLP
901 East Cary Street, Suite 1800
Richmond, Virginia 23219
(804) 697-4119
RMichaux@CBLaw.com

Andrew B. Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

Megan E. Keenan
INFORMATION DIGNITY ALLIANCE
Post Office Box 8684
Portland, Oregon 97207
(925) 330-0359
Megan@InformationDignityAlliance.org

Kirk T Schroder
SCHRODER BROOKS LAW FIRM PLC
15 South Belmont Avenue
Richmond, Virginia 23221
(804) 510-0700
KSchroder@SchroderBrooks.com

*Attorneys for Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned hereby certifies as to the following:

(A)    **Parties and Amici**.  The Parties before this Court are, and before the District Court were, Appellant Neil Zaccari and Appellee Apprio, Inc.  There are no amici or intervenors.

(B)    **Rulings Under Review**.   The rulings under review include the following:

- The District Court's order and opinion granting partial summary judgment (June 1, 2021) (Bates, J.).  It can be found at 4JA954-978 (Dkt. 44-45).  The opinion is available on Lexis at 2021 U.S. Dist. LEXIS 102180.  No official citation exists.

- The District Court's order denying reconsideration (Aug. 27, 2021) (Bates, J.).  It can be found at 5JA1019-1025 (Dkt. 50) and is available on Lexis at 2021 U.S. Dist. LEXIS 205686.  No official citation exists.

- The District Court's order and opinion granting summary judgment (Mar. 31, 2022) (Bates, J.).  The order and opinion can be found at 7JA1782-1811 (Dkt. 64-65).  The opinion is on Lexis at 2021 U.S. Dist. LEXIS 102180.  No official citation exists.

(C)    **Related Cases**.  This case has not previously been before this Court.

This case is on appeal from the U.S. District Court for the District of Columbia.

See Apprio, Inc. v. Zaccari, No. 1:18-cv-02180-JDB (D.D.C. filed Sept. 21, 2018).

There is a related case currently pending in the U.S. Court of Federal Claims.  See

Zaccari v. United States, No. 1:18-cv-00945-PEC (Fed. Cl. filed June 29, 2018)

(Campbell-Smith, J.).[1] [2]

Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm

*Attorney for Appellant*

---

[1] There was another dispute between the Parties in Zaccari v. Apprio, Inc., No. 1:18-cv-1560-JDB (D.D.C. filed June 29, 2018).  That case, *i.e.*, the '1560 case, is not the case on review and is not currently pending, although it had been consolidated with the instant case and then, after disposition, was deconsolidated from this case.  Dkt. 15 (order deconsolidating cases).

[2] Throughout this Brief, all emphasis is added unless otherwise indicated. All statutory citations are to Title 17 of U.S. Code unless otherwise indicated. And, internal citations, brackets, and quotation marks are frequently omitted for the ease of reading.  Original emphasis is often removed unless relevant here, for ease of reading as well.

iv

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY.................................................................................... viii

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED.........................................................................2

    I.    CONTRACT-INTERPRETATION ISSUES .....................................2

    II.   CONTRACT-FORMATION ISSUES ............................................3

    III.  SIGNED-WRITING ISSUES.....................................................4

    IV.  BREACH-OF-CONTRACT ISSUES.............................................4

REPRODUCTION OF RELEVANT STATUTORY PROVISIONS ......................5

STATEMENT OF THE CASE.................................................................9

    I.    ZACCARI PROGRAMS THE PRE-EMPLOYMENT CODE. ..............9

    II.   ZACCARI JOINS APPRIO IN A NON-CODING ROLE. ................10

    III.  ZACCARI EDITS THE PRE-EMPLOYMENT CODE INTO EDITED CODE......12

    IV.  APPRIO TERMINATES ZACCARI AFTER TAKING HIS CODE. .................13

    V.   THE PARTIES' DISPUTE PROCEEDS TO COURT. ....................14

STANDARD OF REVIEW ..................................................................16

SUMMARY OF ARGUMENT .............................................................17

ARGUMENT ..................................................................................18

I.     THE DISTRICT COURT ERRED ON CONTRACT INTERPRETATION. ..........21

    A.     The District Court held that the Contract assigned Zaccari's copyrights under a license provision. ......................................21

    B.     The Contract did not assign Zaccari's copyrights in the relevant software code. ...........................................................21

        i.   The "Assignment of Inventions" Provision........................22

        ii.   The "Unassigned Inventions" Provision ...........................23

        iii.   The "Prior Inventions" Provision .....................................31

    C.     In the alternative, the Contract is ambiguous on the scope of its assignment and license provisions. ......................................34

    D.     Ambiguities in employer-imposed intellectual-property contracts should be resolved in favor of the employee............36

II.    THE DISTRICT COURT ERRED ON CONTRACT FORMATION. .................40

III.   THE DISTRICT COURT ERRED ON THE SIGNATURE REQUIREMENT AND RETROACTIVITY...........................................................................44

IV.    THE DISTRICT COURT ERRED IN ITS BREACH ANALYSIS. ...................62

CONCLUSION ....................................................................................72

CERTIFICATE OF COMPLIANCE ...................................................................73

CERTIFICATE OF SERVICE ...........................................................................74

vi

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co., 131 A.3d 886 (D.C. 2016)..........16

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991). ...........................18

Golan v. Holder, 565 U.S. 302 (2012)....................................................................18

Hensel Phelps Constr. Co. v. Cooper Carry Inc., 861 F.3d 267 (D.C. Cir. 2017). .16

Perkins v. District of Columbia, 146 A.3d 80 (D.C. 2016) .....................................16

## GLOSSARY

| Defined Term | Description |
|---|---|
| Assignment Provision | Contract § 2.3 on "**Assignment of Inventions**" |
| Assignment Exception | Contract § 2.4 on "**Unassigned Inventions**" |
| Edits | The changes that Zaccari made to the Pre-Employment Code to achieve the Edited Code (the extent of which is a matter of dispute between the Parties) |
| Contract[3] | Apprio, Inc's Proprietary Information and Assignment of Inventions Agreement (the same as "PIIA" below) |
| Edited Code | The derivative-work software code that Zaccari edited from the Pre-Employment Code into a derivative work |
| PIIA | Apprio, Inc's Proprietary Information and Assignment of Inventions Agreement (the same as "Contract" above) |
| Pre-Employment Code | The software code that Zaccari personally wrote and programmed in 2008 |
| Prior-Inventions Provision | The nonexclusive-license provision stated in Contract § 2.2 on "**Unassigned Inventions**" which reads: "If, in the course of My Service, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, |

---

[3] Although this Brief refers to Apprio's form contract as a "Contract," it by no means conceded or waives that this was a legally binding instrument upon Mr. Zacarri because he never agreed to it.  <u>See</u> Section II, *infra*.

| | | royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention." |
|---|---|---|
| | Prior Invention | A term defined by the Contract in Contract § 2.2, which reads: "all Inventions that I have […] the scope of this Agreement." |

## JURISDICTIONAL STATEMENT

(A)     This appeal pertains to claims for breach of contract, 1JA30-33 ¶¶ 51-66, and for a declaration of copyright ownership, 1JA33-34 ¶¶ 67-70).  The District Court had exclusive subject-tmatter jurisdiction.  <u>See</u> 28 U.S.C. §§ 1331; 1338(a).

(B)     The District Court entered final judgment below.  7JA1782-1783.  This Court has appellate jurisdiction.  <u>See</u> 28 U.S.C. § 1291.

(C)     The District Court granted summary judgment on March 31, 2022.  7JA1782-1783.  Notice of appeal was timely filed on April 26, 2022.  7JA1812-1813; <u>see</u> 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1).

(D)     This appeal is from a final order and judgment.  7JA1782-1783.

1

## ISSUES PRESENTED

### I.    CONTRACT-INTERPRETATION ISSUES

- Whether, and to what extent, the Assignment Provision assigned Zaccari's copyrights in the Pre-Employment Code and the Edited Code.  <u>See</u> Section I.B.i, *infra*.

- Whether, and to what extent, the Assignment Exception exempted Zaccari's copyrights in the Pre-Employment Code and the Edited Code from assignment.  <u>See</u> Section I.B.ii, *infra*.

- Whether, and to what extent, the Prior-Inventions Provision assigned Zaccari's copyrights in the Pre-Employment Code and the Edited Code.  <u>See</u> Section I.B.iii, *infra*.

- Whether, in the alternative, the Contract's provisions contain ambiguity such that they are fairly susceptible to a reading in Zaccari's favor at summary judgment.  <u>See</u> Section I.C, *infra*.

- Whether, as a matter of D.C. public policy, any ambiguities should be resolved in favor an employee subjected to an employer-imposed, form contract conditioned on preexisting employment.  <u>See</u> Section I.D, *infra*.

2

## II.    CONTRACT-FORMATION ISSUES

- Whether acknowledgment of receipt of a contract constitutes acceptance of that contract in a workplace setting where unilateral policies are imposed upon and acknowledged by employees with some frequency and the contract is described by the employer as a "policy."  <u>See</u> Section II, *infra*.

- Whether language that would clearly indicate contractual formation to a reader is probative of contractual formation where the relevant party never saw it because it was place in small print at the bottom of a proposed contract.  <u>See</u> Section II, *infra*.

## III.   SIGNED-WRITING ISSUES

- Whether acknowledgement of receipt of a contract satisfies the statute of frauds for the District of Columbia, D.C. Code § 28-3502.

- Whether acknowledgment of receipt of a contract constitutes a signature sufficient to assign ownership of a copyright as required by the Copyright Act, §204(a).

- Whether acknowledgement of receipt of a contract satisfies the E-Sign Act , 15 U.S.C. § 7001(a), for the purposes of satisfying the statute of frauds for the District of Columbia, D.C. Code § 28-3502, or the Copyright Act, §204(a).  <u>See</u> Section III, *infra*, for all.

## IV.   BREACH-OF-CONTRACT ISSUES

- Whether Zaccari breached the Contract.  <u>See</u> Section IV, *infra*.

## REPRODUCTION OF RELEVANT STATUTORY PROVISIONS

- Section 101 of Title 17 of United States Code reads, in pertinent part:

### § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

[…]

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

[…]

- Section 103 of Title 17 of United States Code reads, in pertinent part:

  **§ 103. Subject matter of copyright: Compilations and derivative works**

  […]

  **(b)** The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

- Section 201 of Title 17 of United States Code reads, in pertinent part:

**§ 201. Ownership of copyright**

**(a) Initial ownership.**  Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

[…]

**(d) Transfer of ownership.**

**(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

**(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately.  The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

[…]

7

- Section 204 of Title 17 of United States Code reads, in pertinent part:

**§ 204.  Execution of transfers of copyright ownership**

**(a)** A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

[…]

## STATEMENT OF THE CASE

## I.    ZACCARI PROGRAMS THE PRE-EMPLOYMENT CODE.

Defendant-Appellant Neil Zaccari has substantial background creating computer programs, *i.e.*, software code, from work he did in the 1980s and 1990s. 6JA1448:pages87-88; 6JA1527 ¶ 5) ("years of prior experience writing software")

In 2008, Zaccari created a software program that could be used to conduct a contract review, which will be termed the **Pre-Employment Code**.  4JA908 ¶ V.A) (expert report) ("The software at issue in this case functions as a document keyword search tool, which means that it opens a document, searches for a keyword, and creates an index where instances of the keyword(s) are found.  In 2008, and currently, this is a genuine business problem that organizations of all sizes were and are grappling with and seeking solutions for how to address document keyword searches.).  Critically, it was written in 2008—well before Zaccari joined Apprio.  6JA1526 ¶ 2) ("The software program 'Scan A Document for Compliance Requirements' was designed and written in March 2008.  This is the base code of the CRR Software.").

9

## II.     ZACCARI JOINS APPRIO IN A NON-CODING ROLE.

Since the early 2000s, Zaccari has been employed as a workflow-process professional.  6JA1446:pages79-80).  This means that, professionally, he advises companies how to improve—*i.e.*, streamline, standardize, expedite—their processes in order to enhance performance.  6JA1448:page86:22) ("Continuous improvement").  For example, from 2006-2007, he advised a powerplant how to optimize its maintenance outages to "reduce the number of hours that the turbo generators were offline." 6JA1447:page83:20-25).

Enter Apprio.

In 2015, Apprio was seeking to hire just such a workflow-process professional.  5JA1166 (Apprio job posting for "Senior Process Manager").  For present purposes, the key point about this role is that it did *not* involve any software engineering or computer programming.  Id.  Notably, its "**Required Skills & Knowledge**" for the role didn't require programming skills.  Id. (emphasis in original) (only requiring "Lean Six Sigma Black Belt or Higher"— *not* computer-programming skills).

Apprio needed Zaccari's workflow-process skills because it had a contract with the federal government for "Business Process Reengineering[.]"  7JA1718; 7JA1718 ("General Management Consulting Services").

10

And, although the "**<u>General Description</u>**" of the work mentions "prototyping and development of *<u>automated</u>* tools[,]" <u>e.g.</u>, 7JA1725¶1), the "**Specific Requirements**" disclose that software was not among the "Deliverables" due to be delivered under numerous contracts, <u>e.g.</u>, 7JA1727.

### III.    Zaccari Edits the Pre-Employment Code into Edited Code.

In 2016, while Zaccari was an employee of Apprio but not during working hours or at a work site, Zaccari created the 2016 **Edited Code** by implementing **Edits** to the **Pre-Employment Code**.

The extent of the Edits is disputed.  Compare, e.g., 6JA1432:page24:13-14 ("The lion's share, the majority of the software was written in 2008"); 4JA908 ¶ v.D ("minor differences"), with, e.g., 7JA1754 ¶ 46 ("More than half of the code between the two apps is different (222 difference lines versus 187 same lines) with 10 additional functions added to the 2016 code that were not present in the 2008 code."); 7JA1754 (Dkt. 62-8 at 12 ¶ 49) ("[M]ore than 50% of the Apprio app was written new and independently of the Zaccri code[.]").

Yet, the extent of the edits isn't dispositive to the issues on appeal.  Rather, it's a disputed issue of fact that is not material to the present issues.  That's because the arguments between the Parties do not turn on *how much* the Edits changed the Pre-Employment but rather *the fact that* the Edits changed the Pre-Employment Code into the Edited Code and the *timeline* of their creation—"2008," 4JA921 ¶ 4), vs. 2016.

12

## IV.   APPRIO TERMINATES ZACCARI AFTER TAKING HIS CODE.

Zaccari had created his code independently of his job and presented it to

Apprio as a win-win, a possible licensing opportunity that could help both him and

Apprio.  4JA923 (Dkt. 34-4 at 3 ¶ 12).  Zaccari has related the following events

that occurred after he showed the Edited Code to Apprio:

> [A]fter a few demonstrations for different colleagues, Apprio demanded that I give them the code to my software.  They threatened me with my job if I did not turn it over.  Faced with that decision, and as directed, I emailed my updated code to my colleagues.  After Apprio took my software they called it "ConCISE" and turned it over to DCMA who deployed it to thousands of their employees.

4JA923 ¶ 13).

Then, Apprio provided a document for Zaccari's review—a document they

had repeatedly misconstrued as a "policy" but was actually a contract:

> In June 2016, I was notified that there was a policy for me to review in ADP, the human resources software that Apprio uses.  I went to the ADP site on my work computer and saw that the document to review was called "Proprietary Information and Assignment of Inventions Agreement."  This was the first time I saw this document.  I clicked a link and proceeded to the document.  In the document, my only option on the computer screen was to press a button reading "Acknowledge."

4JA923¶¶14-16).

Apprio later fired Zaccari.  5JA1301 (May 2017).

13

## V.    THE PARTIES' DISPUTE PROCEEDS TO COURT.

After Apprio fired Zaccari while using his software creations to enrich itself, the Parties sued each other over the rights in the software.[4]  Specifically, Apprio sued Zaccari asserting two claims below:

1.    Apprio asserted a claim for breach of the Contract.  1JA30-33¶¶51-66).

2.    Apprio also sought a declaration that Mr. "Zaccari is *not* the owner of" his intellectual property.  1JA33-34¶70.

Zaccari answered Apprio's claims, disputing both, 1JA224-226¶¶51-70, and asserting a declaratory counterclaim himself, 2JA303-304¶¶49-51.

Then, Apprio moved for partial summary judgment seeking a declaration that it had received "contractual assignment" of rights.  2JA374-375 (Dkt. 31).  Zaccari opposed Apprio's motion.  4JA866-887 (Dkt. 34).  Apprio replied.  4JA926-948 (Dkt. 39).

---

[4]  In separate actions, Mr. Zaccari had filed suit against the federal government in the Court of Federal Claims, Zaccari v. United States, No. 1:18-cv-00945-PEC (Fed. Cl. filed June 29, 2018), and against Apprio in the District Court, Zaccari v. Apprio, Inc., No. 1:18-cv-001560-JDB (D.D.C. filed June 29, 2018).

14

Then, the District Court granted partial summary judgment. 4JA954 (Dkt. 44). It held that the Zaccari was bound by the Contract, 4JA962-970 (Dkt. 45 at 8-16), and that the Contract assigned Zaccari's rights to Apprio, 4JA970-978 (Dkt. 45 at 16-24). Zaccari moved for interlocutory reconsideration, 4JA979-990 (Dkt. 47)—which was opposed, 4JA991-1009 (Dkt. 48), and denied, 4JA1019-1025 (Dkt. 50).

Then, Zaccari moved for Rule 54(b) entry of judgment to immediately appeal the District Court's partial summary-judgment decision, as the contract-interpretation and contract-formation issues form the heart of this dispute. 4JA1026-1036 (Dkt. 53). Apprio opposed. 4JA1037-1053 (Dkt. 54). And, the District Court denied Zaccari's motion for Rule 54(b) judgment, 4JA1067-1076 (Dkt. 57), so the case proceeded.

Apprio then moved for summary judgment, 4JA1077-1079 (Dkt. 59), arguing that that, in light of the District Court's prior rulings on the Contract, Zaccari had breached, 4JA1080-1096 (Dkt. 59-1). Zaccari opposed, bringing to light new evidence regarding contract formation. 6JA1495-1518 (Dkt. 62).

The District Court granted the motion, entering final judgment. 7JA1782-1783 (Dkt. 64) (order); 7JA1784-1811 (Dkt. 65) (opinion). Zaccari timely appealed. 7JA1812-1813 (Dkt. 66).

15

## STANDARD OF REVIEW

All issues on appeal are reviewed de novo, with factual inferences made in Zaccari's favor as the non-movant at summary judgment.  E.g., Hensel Phelps Constr. Co. v. Cooper Carry Inc., 861 F.3d 267, 272 (D.C. Cir. 2017) ("de novo" review with "inferences are drawn in the nonmovant's favor").

Contract interpretation is a legal issue reviewed de novo.  E.g., Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co., 131 A.3d 886, 894 (D.C. 2016) ("The proper interpretation of a contract, including whether a contract is ambiguous, is a legal question, which this court reviews *de novo*." (italics in original).  Likewise, contract formation is a legal issue review de novo.  E.g., Perkins v. District of Columbia, 146 A.3d 80, 85 (D.C. 2016) ("The existence of an enforceable contract is a question of law reviewed de novo.").

## SUMMARY OF ARGUMENT

**Contract Interpretation**: Even if there was a valid contract, the contract didn't assign Zaccari's copyright in the relevant software code. The Assignment of Inventions provision would only apply the Edited Code. And, the Unassigned Inventions provision didn't apply to the software, as made clear by applying the provision's four factors and referencing nearly verbatim language in state statutes.

**Contract Formation**: Here, no contract was formed because Zaccari never signed and never agreed to the purported contract. Zachari's mere checking of a box ambiguously marked "acknowledge" did not form a contract.

**Signed-Writing Requirements**: Even if there were a contract, the contract terms didn't transfer the copyrighted software because it did not satisfy signed writing requirements, such as §204.

**Breach of Contract**: As a threshold matter, the three contractual provisions were not breached because no contract was ever formed and/or the contract did not assign the copyrighted work in question. Beyond that, even if there was a contractual transfer of the copyright arguendo, there still was not violations of those three provisions, in part, because ownership of copies is distinct from ownership for reasons including §202.

The District Court made numerous errors of contract law and copyright law below.

# ARGUMENT

The central dispute in this case is over who owns certain intellectual property, especially copyrights, to software code that was highly effective in—and also highly valuable for—its capacity to streamline contract review: the creator (Zaccari) or his former employer (Apprio).

There's no serious dispute, however, that Zaccari personally created—*i.e.*, conceived, wrote, programmed, edited—the software code.  Specifically, the Parties do not dispute that **<u>Zaccari</u>** personally created the pertinent software code by programming it.  <u>See</u> 4JA958 (Dkt. 45 at 4) ("The parties *agree* that Zaccari brought *his creation*[…]").

As a result, Zaccari is the legal **<u>author</u>** of the software because he is its natural-person creator.  <u>See</u>, <u>e.g.</u>, <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 346 (1991) (defining "author" as "he to whom anything owes its origin; originator; maker").

Further still, *because* he is the legal author, Zaccari is also the initial **<u>owner</u>** of the copyrights.  <u>See</u> §201(a) ("(a) Initial Ownership. – Copyright in a work protected under this title vests initially in the author[.]"); <u>Golan v. Holder</u>, 565 U.S. 302, 331 (2012) ("Rights typically vest at the outset of copyright protection, in an author[.]").

18

In short, as the natural-person creator, Zaccari is also the legal author for the software.  <u>Feist</u>, 499 U.S. at 346.  And, as the legal author, he's also the initial owner of the copyrights.  §201(a).

Yet, Apprio is asserting that <u>*it*</u> is the copyright owner of the software. 1JA33 (Dkt. 1 at 16-17 ¶¶ 67-70).  Since Zaccari has "Initial Ownership" of the copyrights in question, <u>see</u> §201(a), the <u>*only*</u> way that Apprio could be the owner is to have received a "Transfer of Ownership" from Zaccari, <u>see</u> §201(d); §201(d)(1) (permitting transfer of "ownership" via "any means of conveyance" including contract).[5]

To show transfer, Apprio argues that its Contract—its "Apprio, Inc. Proprietary Information and Assignment of Inventions Agreement" or "PIIA," <u>see</u> <u>generally</u> 1JA130-133 (Dkt. 1-5 at 2-5)—did just that.

_____

[5]  Below, Apprio alleged an exception, known as work-made-for-hire doctrine, to the default rule of natural-person authorship by the individual creator. <u>E.g.</u>, 1JA18 (Dkt. 1 at 1) ("work made for hire").  If that doctrine applied, *<u>Apprio</u>* would be the legal author, *<u>not</u>* Mr. Zaccari.  <u>See</u> §201(b) (if "work made for hire" then "employer" is "considered the author").  Yet, this doctrine is not at issue on appeal: Apprio didn't raise it in its motions for summary judgment and the District Court didn't it.  Nor is it seriously alleged insofar as Mr. Zaccari did not create the software within the "scope of his […] employment;" §101(1) (first prong of work-made-for-hire definition), and because it was not "specially ordered or commissioned" by Apprio, §101(2) (second prong of work-made-for-hire definition).  Ultimately, the exception is not at issue in this appeal.

Below, the District Court agreed with Apprio at summary judgment, holding that the Contract had assigned Zaccari's copyrights to Apprio in full.  4JA955-978 (Dkt. 45).

The District Court erred.  Its central flaw, and the primary dispute here on appeal, relates to contract interpretation: did the District Court misinterpret the contractual provisions?  Zaccari submits that the Contract did _not_ transfer ownership over, *i.e.*, assign, his software copyrights to Apprio.  At best, it transferred a mere portion of the copyrights.  See Section I, *infra* (contract-interpretation argument).

The District Court erred further still.  Zaccari never agreed to the terms of the Contract—but rather acknowledged his receipt of them when presented with them and given no option to decline—so the District Court erred in holding that a binding contract (and concomitant transfer of copyright ownership) occurred.  See Section II, *infra*.  Furthermore, the District Court misapplied the signed-writing requirements.  See Section III, *infra*.

Finally, because the District Court's breach-of-contract analysis is predicated upon  its earlier copyright-assignment analysis, reversal of the earlier order entails at least vacatur of the later one.  Yet, even assuming *arguendo*, that the District Court was correct about assignment, it adopted unreasonable readings of the remaining of the Contract's other provisions.  See Section IV, *infra*.

20

For all these reasons, the District Court erred below.  It should be reversed and remanded.

## I.    THE DISTRICT COURT ERRED ON CONTRACT INTERPRETATION.

### A.    The District Court held that the Contract assigned Zaccari's copyrights under a license provision.

The District Court held that Zaccari had *assigned* (*i.e.*, transferred ownership in) the copyright under the nonexclusive license found in the Prior-Inventions Provision.  4JA970-978 (Dkt. 45 at 16-24); but see §101 (defining "transfer of copyright ownership" as an "assignment" but *not* including a "nonexclusive license).

That was error.

### B.    The Contract did not assign Zaccari's copyrights in the relevant software code.

There are three critical provisions of the contract at issue on appeal of the District Court's decision on contract interpretation: the Assignment Provision, see Section I.B.i, *infra*; the Assignment Exception, see Section I.B.ii, *infra*; and the Prior-Inventions Provision, see Section I.B.iii, *infra*.  Zaccari contends they give Apprio no assignment—certainly no complete assignment of his copyrights in his code.

21

i.    The "Assignment of Inventions" Provision

*First*, A key point is that the Edited Code and the Pre-Employment Code are two separate copyrighted works.  See §101 (defining "derivative work" as a separate "work" from the original work); §101 (defining "created": ""each version constitutes a separate work").  Thus, the Pre-Employment Code and the Edited Code are two separate copyrighted works.

*Second*, the Pre-Employment Code is plainly not assigned by the Assignment Provision because it was made in 2008—years before the "period of My Service" that began in 2015.  See 1JA131.

*Third*, under this provision, the Edited Code is assigned only to the extent the expression was "made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of My Service."  See 1JA131. The only portions that were made during Zaccari's employment were the Edits— meaning the remainder would not be assigned under the plain language of the Contract that only assigns what it "made" *during* "My Service."  Indeed, this reading is reinforced by the divisibility of copyright into parts.  See §201(d)(1) (permitting transfer "in whole or in part").  Only the Edits—the parts made in 2016—would be transferred but no the preexisting code.

*Fourth*, indeed, this makes sense because the derivative-work Edited Code copyright only contains the copyright to the new expression, not the preexisting

expression. §103(b). It's the Pre-Employment Code that contains the protection for the earlier expression. See id. ("preexisting material").

*Fifth*, finally, summary judgment was improper because the contractual term "during the period of My Service" is ambiguous between two fair readings: the working hours or the entire calendar period of employment. See, e.g., Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 913 (9th Cir. 2010). If the former, then nothing was assigned at all under the Assignment Provision because Zaccari made the edits outside of working hours.

### ii.    The "Unassigned Inventions" Provision

Properly construed, Section 2.4 of the purported contract did **not** assign the copyrighted software here. Notably, Section 2.4 (the "unassigned inventions" provision) is a form contract provision that closely tracks a number of state-law statutes. Accordingly, the Unassigned Provision is a term of art provision that matches and mirror statutes and so should be construed like them. Section 2.4's "Unassigned Inventions" clause tracks, nearly verbatim, a somewhat common statute that *limits* employer's claims to employee intellectual property. And, although D.C. does not appear have such a statute, the other statutes and their interpretations give highly persuasive authority as to how to properly construe the Unassigned Inventions Clause.

23

Compare the boilerplate language of Section 2.4 with the language of these state statute's limiting an employer's claims to employee intellectual property.

Here's the Contract's language, which has 4 requirements for an employee creation to be unassigned:

> **Unassigned Inventions**. I recognize that this Agreement will not be deemed to require assignment of any invention that was **[1]** developed entirely on my own time **[2]** without using the Company's equipment, supplies, facilities, or trade secrets and **[3]** neither related to the Company's actual or anticipated business, research or development, **[4]** nor resulted from work performed by me for the Company.

Dkt. 1-5 at 3 § 2.4 (bolding in original, bolded brackets supplied).  Now, consider and compare the language of California Labor Code § 2870(a), which tracks the unassigned provision in the Contract almost identically:

> (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee [**1**] developed entirely on his or her own time **[2]** without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

24

(1) **[3]** Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) **[4]** Result from any work performed by the employee for the employer.

Cal. Lab. Code § 2870(a) (bolded brackets supplied).

Notice that the four requirements in the Contract's provision nearly verbatim mirror the California statute. And, it's not just California. A number of states have nearly identical statutes *limiting* the assignment of intellectual property by employment contracts. See E.g., 19 Del. C. § 805 (Delaware); 765 ILCS 1060/2 (Illinois); K.S.A. § 44-130 (Kansas, enacted 1986); Minn. Stat. § 181.78 (Minnesota, enacted 1977); N.C. Gen. Stat. § 66-57.1 (North Carolina); Rev. Code Wash. § 49.44.140 (Washington, enacted 1979).

Thus, Section 2.4 is merely implementing a "term of art provision" that references (and so complies with) various state laws that limit an employer's ability to claim an employee's intellectual property.

In this sense, Apprio's Unassigned Inventions Provision seems to be "making virtue out of necessity" insofar as its unassigned carveout, if narrower, would be deemed contrary to public policy in many states. Eaton Corp. v. Giere, 971 F.2d 136, 139 (8th Cir. 1992). Under these statutes (and related common law), "employees retain certain rights to discoveries made without using company time

25

or property." <u>In re Int'l Endoscope Mfrs., Inc.</u> 1986 U.S. Dist. LEXIS 19274, \*12 (E.D. Penn. Oct. 9, 1986). In this sense, Mr. Zaccari is within the "protective ambit of California's Section 2870" and similar statutes because the Contract mirror them nearly verbatim. <u>Personalized User Model, L.L.P. v. Google, Inc.</u>, 2014 U.S. Dist. LEXIS 47570, \*12 (D. Del. Apr. 7, 2014).

And, the cases construing these statutory provisions—or contractual provisions that mirror them—consistently require that there be a relation between the invention and *the work done by the employee* for the employer. In other words, the invention must be related to the **employee's** actual or anticipated work.

Here, Mr. Zaccari was hired by Apprio as a workflow-process professional. His job was to advise companies how to streamline, expedite, and standardize their processes to enhance company performance. 6 J.A. 1448 (Dkt. 59-16 at 24:page86:22) ("Continuous improvement"). Notably, the "Required Skills & Knowledge" for the role *did not require programming skills*. Dkt. 20-1 at 22-23. What it did require was "Lean Six Sigma Black Belt or Higher," a methodology for creating portfolios of improvement projects for businesses. Dkt. 20-1 at 22-23. ; (Zaccari Decl. ¶ 2.). Thus, Mr. Zaccari's actual or anticipated business at Apprio did not involve any coding or computer programing.

***

Section 2.4 uses the language employed by numerous state statutes designed to set limits on an employer's ability to claim an employee's intellectual property. This near identical language has repeatedly been construed by various courts to mean that an employer can only claim . Thus, properly construed, the language of Section of 2.4 is limited to "actual or anticipated" work that the employee does for the employer. Accordingly, because the use of the work here was outside Zaccari's (i.e., the *employee's*) actual or anticipated work for the company, Section 2.4 does not apply.

* * * * *

Even if one reads the Assignment Exception as a series of four elements, Zaccari's software meets all four.

        1.     <u>It is developed entirely on Zaccari's own time. 1 JA 130 (Dkt. 1-5 at 3).</u>

Zaccari developed the pre-employment code prior to his employment at Apprio. JA 1432. Zaccari edited the pre-employment code into the edited code on a weekend. (Zaccari Decl. ¶ 9–10). Thus, the code was developed entirely on Zaccari's own time.

27

2.    <u>Without using any of Apprio's equipment, supplies, facilities,</u> <u>or trade secrets. 1 JA 130 (Dkt. 1-5 at 3).</u>

Zaccari edited the pre-employment code into the edited code using his own computer at his home. (Zaccari Decl. ¶ 9–10). And, nothing in the record establishes that the information Zaccari used to create the Edited Code is protected by trade secrets. Thus, the code was developed without using any of the company's equipment, supplies, facilities, or trade secrets.

3.    <u>Not related to Apprio's actual or anticipated business. 1 JA 130</u> <u>(Dkt. 1-5 at 3).</u>

Apprio argued before the district court that Zaccari's software fell within the scope of Apprio's actual and anticipated business. Dkt. 31-1 at 5. However, here, Apprio's creation of the software for the government violates the anti-corruption regulation 48 C.F.R. 9.5.

The regulation requires "a contractor that provides systems engineering . . . for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production shall not - (1) Be awarded a contract to supply the system or any of its major components"); § 9.505-1(b) ("Systems engineering includes . . . determining specifications . . . developing test requirements . . . ." 48 CFR § 9.505-1(a).

28

Here, Apprio was hired by the government to provide systems engineering services. By the terms of the regulation, it was a violation of this anti-corruption regulation for Apprio to provide these services and *also* provide the software that it had determined the specifications and developed test requirements for.   Thus, to read this contractual provision to mean that creating this software would be within Apprio's actual or intended business would be an interpretation that lends itself to a violation of the anti-corruption regulation

It is not reasonable for Zaccari to expect that Apprio's actual or anticipated business would violate the law.

And, contracts should not be interpreted to violate the law. Cf. Capital Constr. Co., 604 A.2d at 429-30 ("In the District of Columbia, it is a principle of long standing that an illegal contract, made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no right upon the wrongdoer."); see Moore v. Jones, 542 A.2d 1253, 1255 (D.C. 1988) (acknowledging a "contract[] may be held invalid if it violates a criminal or regulatory statute").  Therefore, Zaccari's software code did not relate to Apprio's actual or anticipated business.

    4.    Did not result from work performed by Zaccari. 1 JA 130 (Dkt. 1-5 at 3).

29

Zaccari was hired by Apprio as a workflow-process professional. His job was to advise companies how to streamline, expedite, and standardize their processes. 6 JA 1448 (Dkt. 59-16 at 24:page86:22) ("Continuous improvement"). Notably, the "Required Skills & Knowledge" for the role *did not require programming skills*. Dkt. 20-1 at 22-23. Thus, the software did not result from the work that Zaccari performed for Apprio because Zaccari's work did not include coding or programming.

"

iii.   The "Prior Inventions" Provision

*First*, the Prior-Inventions Provision mentions a "nonexclusive license" but that cannot be an assignment or transfer of copyright ownership for a simple reason: a nonexclusive license is *definitionally*, not a transfer of copyright ownership.  <u>Compare</u> 1JA131 ("nonexclusive […] license" <u>with</u> §101 (defining "transfer of copyright ownership" to ***exclude*** a "nonexclusive license").  So, the District Court's fundamental flaw in contract interpretation below was to confuse a nonexclusive license with a transfer of copyright ownership.  <u>See</u> <u>id.</u>; <u>id.</u> (defining "Copyright owner").  So, even if the nonexclusive license provision of the Prior-Inventions Provision was triggered, it wouldn't transfer *ownership*—the rights that Apprio sought declaration of below.

*Second*, Prior Invention is a defined term in the Contract.  1JA130.  And, it only applies to Inventions made "prior to the commencement of My Service[.]"  <u>Id.</u>  In other words, the Edited Code is plainly not subject to this provision because it was made in 2016—*during Zaccari's employment with Apprio*.

*Third*, the Pre-Employment Code is not subject to the nonexclusive license. That's because it was <u>*never*</u> incorporated into any "Company product, process or machine[,]" <u>see</u> 1JA131 ("If, in the course of My Service, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual,

worldwide license[.]").  *But*, Zaccari never send the 2008 Pre-Employment Code to Apprio (and the Edited Code isn't subject to the license because it was created during Zaccari's employment).

_Fourth_, nothing was ever "incorporated" **_by Zaccari personally_** into an **_Apprio_** product, process, or machine.  At most, Zaccari emailed the Edited Code (not a Prior Invention) to Apprio.  4JA923 (Dkt. 34-4 at 3 ¶ 13). But, emailing a program is not the same as incorporating into a product, process, or machine.

Fourth, the Pre-Employment Code is also not a Prior Invention under the Contract.  That's because it (1) wouldn't be personally used by Zaccari _in his role_ at Apprio, see 1JA130 (requiring that a Prior Invention be something that "I [**Zaccari personally**] both (a) may use _in connection with My Service_ ( that  didn't grant ownership because, _even if they w_

THE BASE CODE AND THE NON-EDITED PORTIONS OF THE INTERFACE WERE NOT MADE DURING THE EMPLOYMENT

103(B)

204(D)

6JA1527 (Dkt. 62-2 at 3 ¶ 12) ("I did not have security clearance to access any secure network of Apprio or the DCMA until November 2016, and never had access to any Apprio or DCMA computer code.").

**C.    In the alternative, the Contract is ambiguous on the scope of its assignment and license provisions.**

The procedural posture of this case as it comes to this Court is summary judgment.    4JA954 (Dkt. 44) (order granting "partial summary judgment"); 7JA1782 (Dkt. 64 at 1) (order granting "summary judgment").    And, this summary-judgment posture is important.

This summary-judgment posture matters because "[w]hether an agreement is clear on its face or ambiguous has a direct bearing on the appropriateness of summary judgment in contract disputes."    E.g., NRM Corp. v. Hercules, Inc., 758 F.2d 676, 682 (D.C. Cir. 1985).    In the face of ambiguous contract language, "summary judgment is *improper*."    Id.; National Trade Prods. v. Information Dev. Corp., 728 A.2d 106, 109 (D.C. 1999) ("In cases involving contract interpretation, whether a genuine issue of material fact is in dispute will depend generally upon whether the contract is ambiguous.");

"Summary judgment on a contract dispute is generally inappropriate unless the dispute is controlled by unambiguous contract language."    E.g., Feld v. Fireman's Fund Ins. Co., 909 F.3d 1186, 1194-1195 (D.C. Cir. 2018); Harbor Ins. Co. v. Schnabel Foundation Co., 946 F.2d 930, 934 (D.C. Cir. 1991) (summary judgment "inappropriate" where "contracts were ambiguous."); Parker v. U.S. Trust Co., 30 A.3d 147, 150 (D.C. 2011) (same).

34

In turn, a "contract is ambiguous, permitting resort to extrinsic evidence for its interpretation, when it is 'reasonably or fairly susceptible of different constructions or interpretations.'" E.g., <u>Dist. No. 1 – Pac. Coast Dist., Marine Eng'rs' Ben. Ass'n v. Travelers Cas. & Sur. Co.</u>, 782 A.2d 269, 274 (D.C. 2001). Given this standard, "the test for determining the clarity of contract terms is formulated, the core notion is clear: summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way." <u>E.g.</u>, <u>Davis v. Chevy Chase Financial, Ltd.</u>, 667 F.2d 160, 169-170 (D.C. Cir. 1981).

Here, *even if* the Court doesn't think that there's an objective reading in Zaccari's favor as argued above, <u>see</u> Section I.B, *supra*, there are at least ambiguities that would render the granting of summary judgment on contract interpretation below improper.

For example, Zaccari acknowledges that the phrase in Contract Section 2.3 "**during the period of My Service**" is fairly susceptible to two different readings—(a) assigning works made during the specific time periods that Zaccari was actually working for Apprio (his reading) or (b) assigning works made during the calendar period of Zaccari's employment with Apprio globally.  Its ambiguous in this sense.  <u>See</u> Section I.B.i, *supra*.

35

Yet, Zaccari submits that no reasonable reading that "during the period of My Service" provision would indicate that it assigns works that ***predate*** employment with Apprio.  See id.

Likewise, Zaccari submits that no reasonable reading of the Contract could construe Contract Section 2.2's "**nonexclusive** […] license" (even if it applied) as an assignment because, definitionally, it's not an assignment.  Compare 1JA131 (Dkt. 1-5 at 3) with §101 ("A '**transfer of copyright ownership' is an assignment**, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, **but not including a nonexclusive license**."); see Section I.B.iii, *supra*.

### D.     Ambiguities in employer-imposed intellectual-property contracts should be resolved in favor of the employee.

In addition, under the doctrine of *contra* proferentem, ambiguity in this form Contract should be resolve *against the drafter*, *i.e.*, against Apprio (employer, drafter, form contract, purported licensee/assignee).  Ambiguity should be resolved in favor of Zaccari for three reasons:

1.     Apprio chose the form contract to try to impose upon Zaccari.

2.     *Contra proferentem* resolves ambiguities against the drafter.

3.     Apprio's purported *contra-proferentem* waiver is unenforceable.

36

*__First__*, Apprio provided a form contract of its choosing, triggering the doctrine of Contra Proferentem.  Apprio provided Zaccari with the Contract using its human resources system.  Upon opening the Contract, the only option Zaccari had was to "acknowledge" the Contract.  There was no "decline" or similar button displayed in connection with the Contract.

Apprio presented Zaccari with the Contract **months after** Zaccari had started working for Apprio. Apprio informed Zaccari that signing the Contract was a condition of his continued employment. Indeed, Apprio made clear that Zaccari could be terminated if he did not sign the Contract. See generally Statement Sections I-IV, *supra*.

*__Second__*, because Apprio chose the form contract, the doctrine of Contra Proferentem requires that the Contract be strictly construed against Apprio.  A party that provides a form contract is treated as the drafter of that contract. Dale Denton Real Estate v. Fitzgerald, 635 A.2d 925, 929 n.8 (D.C. Ct. App. 1993); Mines v. Cathie Gill, Inc., 2015 D.C. App. LEXIS 444, *8 (D.C. Ct. App. Aug. 13, 2015).

And, an ambiguity in a contract *is strongly construed against the drafter*. Mines 2015 D.C. App. LEXIS 444 at 8; Dale Denton Real Estate 635 A.2d 925 at 929 n.8; American Bldg. Maintenance Co. v. L'Enfant Plaza Properties, 655 A.2d 858, 862-863 (D.C. 1995); Restatement (Second) of Contracts § 206.

37

_**Third**_, the ambiguity should be construed in Zaccari's favor, despite Apprio's purported waiver of Contra Proferentem because such waiver is unenforceable.        Section 11.9 of the Contract states that "no rule of strict construction shall be applied against any party hereto[.]" 1JA131. However, this provision is unenforceable, and it violates public policy.

Indeed, there "are sound public-policy reasons behind a black letter rule that when contractual provision are drafted entirely by one party, any ambiguity in the contract is to be construed against the drafter." Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 461 (Mich. Sup. Ct. 2003) (Cavanagh, J., concurring in the result); c.f. Cameron v. USAA Prop. & Cas. Ins. Co., 733 A.2d 965, 968 (Contra Proferentem is based on sound public policy); c.f. Degliomini v. ESM Prods., 253 A.3d 226, 238 (Penn. Sup. Ct. 2021) (a provision can't "contravene public policy").

Purporting to waive Contra Proferentem is contrary to public policy and unenforceable. C.f. Sinclair Oil Corp. v. Republic Ins. Co., 929 P.2d 535, 539 (Wyo. Sup. Ct. 1996) ("the terms must not conflict with […] public policy"); George S. May Int'l Co. v. King, 629 N.E.2d 257, 263 (Ind. Ct. App. 1994) ("We strictly construe contract terms which affect public policy."); Klapp 663 N.W.2d 447 at 461(Cavanagh, J., concurring in the result).

Apprio's provision is unenforceable because Contra Proferentem is a legal standard for contract construal.  "Like the contract rule preferring interpretations that favor the public interest, see id., at 304, contra proferentem seeks ends other than the intent of the parties." <u>Lamps Plus, Inc. v. Varela</u>, 139 S. Ct. 1407, 1417 (2019). It is used when "none of the canons of construction succeed in dispelling the uncertainty." <u>Oceanside 84, Ltd. v. Fidelity Federal Bank</u>, 56 Cal. App. 4th 1441, 1448 (1997).  And, legal standards can't be waived.

## II.    THE DISTRICT COURT ERRED ON CONTRACT FORMATION.

A central dispute between the parties below, was whether Zaccari's checking a box marked "acknowledge" rather than "accept." Dkt. 45 at 11. Zaccari argued that merely checking a box marked "acknowledge", unaccompanied by conspicuous terms indicating "agreement" to a binding agreement was sufficient for the formation of a contract. After all, the record nowhere indicates that Zaccari ever signed the PIIA nor that he ever affirmatively agreed–he merely acknowledged the PIIA policy.

Below, the District Court side-stepped this dispute, reasoning that even though Zaccari never checked a box marked agree, nevertheless the "terms of the contract" made clear that acknowledge and agree were being used synonymously in the contract. Dkt. 45 at 11. Specifically, the District Court stressed that the "final paragraph treats the two verbs as equivalent[.]" Id.

But that begs the question–and egregiously so on this record. After all, the record demonstrates that Zaccari never read the "final paragraph". Surely an unread term buried at the bottom the contract (and the contract's unread final paragraph at that), can't be used as the basis for contract *formation*.

Moreover a distinction between a box marked "acknowledge" and one marked "agree" accompanied by conspicuous notice of the legal effect is no small

matter. Consider an example. Suppose an attorney receives an email from an opposing counsel regarding a proposed settlement. The email populates an email receipt request–a box asking the counsel to "acknowledge" the settlement email. The attorney clicks "acknowledge." Then, suppose upon opening the email and reading through a long list of proposed terms, buried at the very bottom is a final provision stating "you acknowledge and agree to this settlement offer."

In such a case, the mere clicking "acknowledge" in an email receipt box wouldn't establish assent to the settlement offer–even though the final provision inside the offer happened to use the verbs acknowledge and agree synonymously. After all, the attorney hadn't even read that provision when she clicked "acknowledge" on the email receipt request. At the very least, the use of the ambiguous term "acknowledge" as opposed to "agree" would be ambiguous.

So too here. Here, Mr. Zaccarhy never signed the PIIA. Nor did he ever affirmatively "agree." Instead, he merely checked a box acknowledged on a platform used to "present company policies to its employees." 4JA925 (Dkt. 34-15 at 1 Paragraph Symbol 2) (noting Apprio used its ADP platform to "present company policies to its employees"). But merely acknowledging a company policy does not a contract make.

Indeed, there's good reason most online agreements require the checking a box conspicuously and unambiguously flagged "agree." After all, the basic tenets of "contract formation apply with equal force to contracts formed online." Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855-856 (9th Cir. 2022).  Applied online, basic principles of contract formation require that "**users must check a box explicitly stating "I agree"** in order to proceed. Id. at  856.  Ironically, the District Court chided Zaccari for not realizing that clicking a box on a computer could form a contract:

> It is unlikely that this was the first time Zaccari encountered a contract presented on a computer screen with the option for the user to manifest agreement by clicking a button, and he does not argue otherwise. The tech-savvy Zaccari is undoubtedly familiar with the "clickwrap" agreements frequently encountered by consumers using software or engaging in online transactions."

Dkt. 45 at 11 n.3.

But even the lay consumer, less tech-savvy than Zaccari, would know that such online agreements typically use the unambiguous term "agree"—and for good reason. Indeed, the District Courts own cited case reflects that common practice: "**The contract is entered into by the subscriber clicking an "Accept" button below the scroll box**."). Forrest v. Verizon Communs., Inc., 805 A.2d 1007, 1010 (D.C. 2002); see Dkt. 45 at 11 n.3, citing Forrest.

42

So, yes, online agreements often use box checking to form contracts. But, that doesn't resolve the question of what the box must say. The fact of the matter is that in common practice such online agreements typically use the unambiguous buttons marked "agree" or "accept"--not Apprio's ambiguous "acknowledge."

* * * * *

The Court erred in overlooking the fact that Mr. Apprio never signed and never agreed to the contract. And, by pointing to the final (unread) paragraph in the contract to resolve the meaning of the word "acknowledge" in the acknowledgement box, the Court conflated the issue of contract interpretation with the threshold issue of contract formation.

Doing so here, merely begged the question on the "agree" versus "acknowledge" dispute between the parties here. As a matter of common practice online agreements use "agree." And, the law recognizes that such agreements form a contract where the user "check[s] a box explicitly stating 'I **agree'** in order to proceed. <u>Berman</u>, 30 F.4th at 856 (9th Cir. 2022). But here, Zaccari never agreed. And, Apprio used the ambiguous term "acknowledge." That should have precluded summary judgment on the issue of contract formation.

43

## III.    THE DISTRICT COURT ERRED ON THE SIGNATURE REQUIREMENT AND RETROACTIVITY.

In its Memorandum Opinion [JA 955–978 ("Mem. Op.")], the District Court found Apprio established that:  (1) there is no genuine dispute of material fact that the parties entered into a binding contract; and (2) Zaccari assigned his proprietary rights in the CRR Software to Apprio pursuant to that contract. Mem. Op. at 24 [JA 979].  The District Court subsequently denied Zaccari's motion for reconsideration of the  partial summary judgment decision by Order entered August 27, 2021.  [JA 1019].

Prior to the close of discovery, Zaccari moved for entry of final judgment under Rule 54(b) and for a stay of further proceedings [JA 1026–1036], which was denied by the District Court [JA 1067–1076].  Following the District Court's 's refusal to certify the partial summary judgment ruling as final, Zaccari pursued discovery in support of his argument that the parties did not form an agreement assigning his rights in the CRR Software and, contrary to Apprio's motion for partial summary judgment, issues of material fact exist which preclude entry of summary judgment in this matter.

During the depositions of Mr. Britt and Zaccari, disputed issues of material fact were revealed.  Discovery closed on December 10, 2020.  Min. Order

44

10/27/2021 [JA 15]. Fundamentally, there is a dispute as to whether Zacarri assented to the material terms of the PIIA (which was not clearly decided by the District Court's partial summary judgment ruling), whether Zaccari assigned the CRR Software to Apprio, and, to the extent the District Court affirms that the PIIA governs the relationship between the parties and determines it satisfies the applicable statute of frauds, whether Zacarri breached any of its terms.

Zaccari began his employment at Apprio in 2015. [JA 921–924]. Zaccari was not provisioned into Apprio's ADP until Monday, November 2, 2015 at, 5:20 PM. *Id.* at ¶12 [JA 924]. Because Zaccari did not possess any form of security clearance, he had no internet connectivity at his Defense Contract Management Agency ("DMCA") work location during 2015 and much of 2016. *Id.* at ¶11 [JA 924]. Apprio reports that Zaccari acknowledged the PIIA on June 15, 2016. Apprio000119 [JA 606]. Apprio has not and cannot produce any evidence of when it first presented the PIIA to Zaccari or which version he received on June 15, 2016. Britt Dep. 31:5–34:4 [JA 1560–1563]. Zaccari never signed the PIIA and therefore Apprio has no copy of the PIIA signed by Zaccari. Zaccari Decl. ¶5. [JA 1527].

Incredibly, Apprio cannot reproduce an "E-signed" copy of the PIIA. Britt Dep. 28:24–29:24 [JA 1557–58]. Apprio does not have an E-sign opt out on the PIIA. *Id.* Zaccari's Apprio time sheets only record time against the BPR

(Business Process Redesign) tasks under contracts 00001[6] and 00004.[7]   Zaccari Decl. ¶4 [JA 1526].   Zaccari did not have a Department of Defense security clearance until Nov 2016; therefore, he could not have logged into any secure Apprio or DCMA networks.  *Id.* at ¶12 [JA 1527].

At no point did Zaccari have access to any Apprio generated or DCMA computer code.  *Id.*  Apprio did not and cannot produce evidence that Zaccari incorporated the CRR Software into an Apprio product.  *Id.* at ¶13 [JA 1528].

To the extent the PIIA is enforceable against Zaccari, it provides he is "*free to use information which is generally known in the trade or industry, which is not gained as result of a breach of this Proprietary Information and Assignment of Inventions PIIA (the "PIIA"), and my own, skill, knowledge, know-how and experience to whatever extent and in whichever way I wish.*" PIIA ¶1.2 [JA 129–133].

Facts conceded by Apprio establish he did not use the CRR Software in his work for Apprio.  The CRR Software was not disclosed, used, or published in connection with Zaccari's work for Apprio, was not incorporated by Zaccari into any Apprio product, process, or machine, and Apprio neither requested nor provided written consent for him to do so.  Zaccari Decl. ¶¶13–14 [JA 1528].  The

---

[6]JA1683–1709
[7]JA1716–1737

CRR Software also did not result from Zaccari's work performed for Apprio.  *Id.* at ¶13 [JA 1528].  Apprio did not approach Zaccari to get his consent in writing prior to disclosing the CRR Software to DCMA.  *Id.* at ¶14 [JA 1528].

## ARGUMENT

## A.    THE DISTRICT ERRED IN DETERMINING THAT A CONTRACT EXISTED BETWEEN APPRIO AND ZACCARI

The District Court held Apprio carried its burden that there were no genuine disputes of material fact "that Zaccari assigned his proprietary rights in the CRR Software to Apprio."  Mem. Op. at 21 [JA 975].  But Apprio actually failed to meet its burden that a contract existed.  Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247, 251 (D.C. 2005) (citing Jack Baker, Inc. v. Office Space Development Corp., 664 A.2d 1236, 1238 (D.C. 1995)).  This burden extended to the issue of contract formation.  Novecon Ltd. v. Bulgarian–American Enter. Fund, 190 F.3d 556, 564 (D.C. Cir. 1999).  In the District of Columbia, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms, and (2) intention of the parties to be bound."  Kramer, 888 A.2d at 251 (quoting Georgetown Entertainment Corp. v. District of Columbia, 496 A.2d 587, 590 (D.C. 1985)); see, e.g., Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995) ("to establish a contract the minds of the parties must be in agreement as to its terms") (citations omitted)).  "Whether two parties intended to be bound by the terms of a document

that does not resemble a conventional or prototypical contract can be a question of fact for the jury." E.M. v. Shady Grove Reprod. Sci. Ctr. P.C., 496 F. Supp. 3d 338, 395 (D.D.C. 2020).

Discovery revealed that disputed issues of material fact exist as to whether any such meeting of the minds occurred between Apprio and Zaccari. While he was an employee of Apprio, Zaccari repeatedly informed Apprio that he was the owner of the CRR Software. Zaccari Dep. 42:18–46:8 [JA 1620–24]. Indeed, Zaccari represented that he never assigned anything to Apprio. *Id.* Although the burden rests with Apprio, it could cite to no record evidence that Zaccari intended to assign his rights in the CRR Software by acknowledging the PIIA. Acknowledgement of merely "reading a company policy" such as the PIIA does not equate to assent to the policy. The District Court failed to closely examine the record evidence when finding that a meeting of the minds occurred. Specifically, the District Court failed to consider the testimony of Zaccari and the admission by Apprio that it could produce no copy of the PIIA. Lack of a signature represents evidence that a party did not intend to be bound by an agreement. See, e.g., Bailey, 209 F.3d at 746; The George Town Club at Suter's Tavern v. Salamanca, No. CIV.A.06 2181 EGS, 2007 WL 1041657, at *1 (D.D.C. Apr. 5, 2007). "Where, as here, there is no unambiguous writing governing the parties' relationship, the law requires a 'probing inquiry' into each party's

48

understanding, <u>Howard Univ.</u>, 828 A.2d at 737, but the parties have failed to come forward with the sort of raw factual material or cogent argument that would permit such an inquiry." <u>Am. Prop. Const. Co. v. Sprenger Lang Found.</u>, 768 F. Supp. 2d 198, 206 (D.D.C. 2011). The District Court's decision regarding the meeting of the minds between the parties is wholly dependent on its presupposition that "acknowledge" equates to "agree." Mem. Op. at 13 [JA 967] ("Because acknowledging the PIIA amounts to signing it in this context, Zaccari is bound by its terms."). But there is a disputed material fact as to what Zaccari acknowledge on June 15, 2016. It is not clear whether he assented to accepting all material terms of it or merely acknowledged receiving a copy of it. The District Court erred by not viewing these facts in the light most favorable to Zaccari.

Likewise, the District Court's treatment of the word "signing" does detract from the equivalence drawn between acknowledgment and agreement. The District Court specifically noted that "No signature line is present, so it is clear from context that Apprio did not expect a signature." Mem. Op. at 12 [JA 966]. That Apprio did not expect a signature does not mean that Zaccari assented to be bound to all material terms of the PIIA by acknowledging it.

For these reasons, the District Court erred in determining that a contract was formed and granting Apprio's motion for partial summary judgment on this issue.

49

**B.    THE DISTRICT COURT ERRED IN CONSTRUING AMBIGUOUS LANGUAGE IN THE AGREEMENT AS A MATTER OF LAW**

The District Court relied, in part, on the definition of "Prior Invention" in paragraph 2.2 of the PIIA as the basis to assign Zaccari's rights in the CRR Software to Apprio.  Mem. Op. at 17–18 [JA 971–72].  According to its terms, "[i]f, in the course of . . . Service, [the employee] incorporate[s] a Prior Invention into a Company product, process or machine," then Apprio receives "a nonexclusive royalty-free, irrevocable, perpetual, worldwide license . . . to make, have made, modify, use and sell such Prior Invention."  PIIA ¶2.2.  That this language purports to grant a nonexclusive license to Apprio for the Prior Invention and the ability to sell it renders it ambiguous and unenforceable.

Under the law of the District of Columbia, "[i]n construing a contract, the court must determine what a reasonable person in the position of the parties would have thought the disputed language meant." Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (quotation omitted). "Where the language in question is unambiguous, its interpretation is a question of law for the court." Id. (quotation omitted).  Where the relevant contractual language is ambiguous, however, "[t]he choice among reasonable interpretations . . . is for the fact-finder to make based on the evidence presented by the parties to support their respective interpretations." Nextel Spectrum Acquisition Corp. v.

50

Hispanic Info. & Telecomm. Network, Inc., 571 F. Supp. 2d 59, 63 (D.D.C. 2008) (citing Howard Univ. v. Best, 484 A.2d 958, 966 (D.C. 1984)).  Instead, a contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible to different interpretations or of two or more meanings.  See Burbridge v. Howard Univ., 305 A.2d 245, 247 (D.C.1973).

The District Court erred in interpreting the licensing of a Prior Invention as a matter of law because it is ambiguous.  Section 101 of the Copyright Act excludes nonexclusive licenses from the definition of "transfer of copyright ownership." §101.  And Section 204(a) requires any transfer of ownership to be in writing and signed by the owner.  A nonexclusive license, therefore, does not and cannot provide any exclusive rights in the ownership of the copyright, including the right to sell it.  Alternatively, the same language in paragraph 2.2 could be interpreted to permit Apprio to sell that particular copy of "such Prior Invention."  The purported licensing language in paragraph 2.2 is susceptible to multiple interpretations and, therefore, ambiguous.  Either it is a nonexclusive license or an assignment, but it cannot properly be interpreted to be both as a matter of law, and the District Court erred in doing so.

Notwithstanding the error in misinterpreting the purported license as an assignment, the District Court also ignores the final sentence of paragraph 2.2, that "[the employee] will not incorporate, or permit to be incorporated, Prior Inventions

51

in any Company Inventions without the prior written consent of an authorized officer of the Company."  Apprio never provided Zaccari with any such prior written consent.

## C. THE DISTRICT COURT ERRED BECAUSE THE STATUTE OF FRAUDS PRECLUDES THE ASSIGNMENT OF THE CRR SOFTWARE

The District Court found that "[b]y acknowledging the PIIA with the click of a mouse, Zaccari carried out a 'process . . . logically associated with' the PIIA, and did so intentionally."  Mem. Op. at 14 [JA 968].  The District Court subsequently determined that the Copyright Act's statute of frauds did not bar the assignment of his copyright interest due to the E-Sign Act.  *Id.*.  In the District of Columbia, however, the statute of frauds requires that contracts which cannot be performed within one year to be in writing and signed by the party to be charged in order to support a claim for breach of contract.  *See* D.C. Code § 28–3502.  While the District Court correctly observed that  generally "[t]he lack of a signature is [] not a per se bar to contract formation[,]" Mem. Op. at 12 [JA 966], authority cited in its Memorandum Opinion expressly states that "[u]nless the statute of frauds requires otherwise in a particular case, the contract need not be written[.]" Kramer, 888 A.2d at 251 (emphasis added).  But according to the District Court,

> Zaccari's argument that he never entered into the PIIA with Apprio relies on the notion that the Court should find some meaningful difference between "acknowledging" the PIIA and "signing" or

52

"agreeing to" it. In some contexts, such a difference might exist, but the Court does not believe that any difference can be found here.

Mem. Op. at 11 [JA 965].

The unsigned PIIA does not satisfy D.C.'s Statute of Frauds. *See* D.C. Code § 28-3502 ("An action may not be brought . . . upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, . . . is in writing, which need not state the consideration and signed by the party to be charged therewith or a person authorized by him."). While some acts completed in furtherance of the PIIA can be completed in less than a year, according to its own terms, the PIIA requires:

> At all times during my employment or engagement as an independent contractor by the Company, as the case may be ("My Service"), and thereafter[.]"
>
> . . .
>
> My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the Termination Date[.]
>
> . . .
>
> . . . that for the period of My Service and for two (2) years after the Termination Date, I will not, either directly or through others, solicit or attempt to solicit and Employee (as defined below) to become an employee, consultant or independent contractor to or for myself, or any other person or entity.
>
> . . . [and] that for the period of My Service and for two (2) years after the Termination Date, I will not directly or indirectly (a) solicit,

53

divert, appropriate to or accept on behalf of any Competing Business (as defined below), or (b) attempt to solicit, divert, appropriate to or accept on behalf of any Competing Business, any business from any Customer (as defined below).

PIIA ¶¶1.1, 2.8, 3.1and 3.2.

The District Court failed to consider that the Copyright Act also requires that the PIIA be in writing and signed by Zaccari to affect an assignment of the CRR Software to Apprio. See §204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."). Whether Zaccari's "acknowledgment" was signed by him constituted a disputed issue of fact that should have precluded summary judgment.

In the absence of a signed contract that satisfies both the statute of frauds under the Copyright Act or D.C. law, the District Court erred in granting partial summary judgment to Apprio.

**D. THE DISTRICT COURT ERRED BECAUSE ZACCARI'S ALLEGED ASSENT TO THE AGREEMENT CANNOT SATISFY THE STATUTE OF FRAUDS IN THE COPYRIGHT ACT VIA THE E-SIGN ACT**

In its opinion granting partial summary judgment to Apprio, the District Court relied on the E-Sign Act, 15 U.S.C. § 7001(a), to refute Zaccari's argument that the Copyright Act requires a written signature on any assignment of rights.

Mem. Op. at 13–14 [JA 967–68].  However, even if the E-Sign Act applies to assignments of copyright, after the completion of discovery, Apprio did not produce sufficient evidence of Zaccari's assent to the PIIA.  Without such a showing, the District Court erred in its reliance on the E-Sign Act as a matter of law.

The E-Sign Act provides, "[n]otwithstanding any statute . . . (1) a signature, contract, or other record  .  .  .  may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and (2) a contract . . . may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation."  15 U.S.C. § 7001(a). The term "electronic signature" means "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record."  15 U.S.C. § 7006(5). Before delving into the E-Sign Act and the sufficiency of the purported transfer in this case, it is important to note the particular relationship of the parties.  Apprio seeks the enforcement of an employment agreement that Zaccari contests assent to enter, and Zaccari never willingly transferred a copy of the CRR Software to Apprio, let alone his consent to transfer his ownership rights in it.

Although the D.C. Circuit does not appear to have addressed the issue, other courts—including the Fourth Circuit—have determined that the E-Sign Act applies

55

to transfers of copyrights and mandates the validity of assignments that comply with the terms of that statute, but the assignments are to uphold the intent of the assignor. *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600, 602 (4th Cir. 2013) ("subscriber's electronic agreement" to a Terms of Use PIIA (TOU) by "click[ing] a button to assent to the TOU" constituted a valid assignment of copyrights under Section 204 because, pursuant to the E-Sign Act, "an electronic agreement may effect a valid transfer of copyright interests under Section 204 of the Copyright Act").

The *Metro Reg'l* case is distinguishable from the record in this case primarily because the copyright owners intended to be bound by their electronic signatures. Indeed, *Metro Reg'l* was concerned with the assignee of copyrights in an infringement dispute in which the assignors were not parties. The defendant challenged the effectiveness of the initial assignments from the assignors under Section 204, which agreed to the terms of use of the plaintiff's website and subsequently—and voluntarily—uploaded the copyrighted material. Even though the defendant did not make the argument, the Fourth Circuit was "compelled" to note that "[c]ourts have held that, in situations where the copyright author appears to have no dispute with its assignee on this matter, it would be anomalous to permit a third party infringer to invoke Section 204(a)'s signed writing requirement against the assignee." *Metro. Reg'l*, 722 F.3d at 600 (internal quotation and

citation omitted).  "Put another way, Section 204(a) was intended to resolve disputes between owners and alleged transferees, and was not intended to operate for the benefit of a third-party infringer when there is no dispute between the owner and transferee." *Id.* at 600–01 (internal quotation marks omitted).

While the Fourth Circuit addressed the interplay between the E-Sign Act and Section 204, the First Circuit specifically declined to "address whether a browsewrap agreement may satisfy the writing requirement in §204" while acknowledging the volitional distinction between clickwrap- and browsewrap-type agreements.  Small Just. LLC v. Xcentric Ventures LLC, 873 F.3d 313, 319 n.4, 325 n.14 (1st Cir. 2017).  Presumably if this Circuit were inclined to determine that a clickwrap-style agreement cannot accomplish an effective assignment under Section 204, it would have no problem reaching the same conclusion with respect to the much less meaningful acknowledgement by Zaccari, which—unlike a clickwrap-style agreement—purports to require no affirmative action on his part afterwards.

As the Fourth Circuit explained in *Media Reg'l*:

Section 204(a) is intended "to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or transfers."  SCO Group, Inc. v. Novell, Inc., 578 F.3d 1201, 1211 (10th Cir.2009) [(internal quotation and citation omitted)].  The signed writing requirement also serves the purpose of "enhance[ing] predictability and certainty of ownership—Congress's paramount goal when it revised the Act in 1976."  Effects Assocs., Inc. v. Cohen, 908 F.2d

555, 557 (9th Cir.1990) (internal quotation marks omitted); cf. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 412 (7th Cir.1992) (Copyright Act "make[s] the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable").

Media Reg'l, 722 F.3d at 600.

Moreover, Zaccari neither clicked on an affirmative "yes" agreeing to be bound nor received any copy or confirmation of his alleged assent by clicking "acknowledge." *See* 37 CFR 201.4(d)(1). Even assuming, *arguendo*, that the electronic signature was sufficient at the time Zaccari "acknowledged" it, a disputed issue of material fact existed as to whether Zaccari's clicking "Acknowledge" was an "actual signature" as required under the Copyright Act.

Aside from the factual dispute as to whether there was an intent to sign the PIIA, the Copyright Act requires more than Zaccari's purported assent. As a result, there was no evidence to satisfy the Copyright Act's statute of frauds as a matter of law and the District Court erred in granting Apprio's motion for partial summary judgment.

Likewise, the E-Sign Act requires more than a simple "acknowledgement." Specifically, 37 C.F.R. § 201.4(d)(1), provides:

> Where an actual signature on the relevant document is not a handwritten or typewritten name, such as when an individual clicks a button on a Web site or application to indicate agreement to contractual terms, the remitter must submit a description of the nature of the signature and documentation evidencing the existence of the

signature (*e.g.,* a database entry or confirmation email showing that a particular user agreed to the terms by clicking "yes" on a particular date). <u>Where such description and evidence are provided, the Office will make them available for public inspection and may presume that the signature requirement for recordation has been satisfied, without prejudice to any party claiming otherwise, including before a court of competent jurisdiction.</u>

As stated above, 37 C.F.R. § 201.4(d)(1) requires "evidence" of the click/sign agreement and expressly states that no presumption exists when challenged by a party in court. Apprio presented no evidence establishing the existence of Zaccari's signature.

## E.     THE DISTRICT COURT ERRED IN DETERMINING THE CRR SOFTWARE WAS AN APPRIO PRODUCT

It is axiomatic that summary judgment must be based on the facts before the court and that those facts must be construed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56. There was no evidence presented to the District Court that intellectual property independently created Zaccari during his employment with Apprio was assigned to it or that Zaccari either used the CRR Software in connection with his employment or incorporated it into any Apprio product.

Without providing any citation to the record that Zaccari ever used the CRR Software in his employment, the District Court erroneous stated that "there is no dispute that Zaccari did use the CRR Software, including any prior base code, in

59

connection with his work for Apprio". Mem. Op. at 13 [JA 967]. The undisputed evidence in the record, however, clearly showed that Zaccari never used either the CRR Software or the base code in connection with his employment.

This determination is based on two findings. First, the District Court found that the CRR Software and the base code are not Prior Inventions because Zaccari did not disclose them in a Previous Inventions Disclosure Form. Mem. Op. at 22–23 [JA 976–77]. Second, the District Court found that the CRR Software and the base code do not qualify as an Excluded Prior Invention because "there is no dispute that Zaccari did use the CRR Software, including any prior base code, in connection with his work for Apprio." *Id.* at 23. But the District Court failed to cite any facts or evidence to support this assertion. The only facts in the record relating to the purported "use" of the CRR Software and the base code is Zaccari's own declaration that unequivocally denies any such use or intent to assign it to Apprio. Zaccari Decl. ¶¶ 12–13 [JA 1527–28]. Indeed, there is no evidence that Zaccari ever had any access to or modified any company software products.

## F. THE DISTRICT COURT ERRED IN RETROACTIVELY ASSIGNING THE CRR SOFTWARE TO APPRIO.

Without citing any facts or offering any legal analysis, the District Court also assumed that the PIIA was binding on Mr. Zaccari before he ever

acknowledged its receipt. But the base code was developed in 2008 and the updates were developed in May 2016—a month prior to the first time Mr. Zaccari saw the PIIA. Apprio neither disputed these facts nor presented an effective date for the PIIA. It also cannot be disputed that any provision in the PIIA implies that it should be applied retroactively.

But "a license or assignment in copyright can only act prospectively." Davis v. Blige, 505 F.3d 90, 104 (2d Cir. 2007). As explained by the Second Circuit, "[i]f retroactive transfers and licenses were permissible, one could never reliably and definitively determine if and when an infringement occurred, because an infringement could be 'undone' by the very sort of maneuver attempted by defendants in this case." Id. at 105. Moreover, no employee would find it reasonable to give up rights not normally relinquished in return for the promise of future employment. Feeney v. Transition Automation, Inc., No. CIV A 06-11677-RWZ, 2008 WL 190766, at *7 (D. Mass. Jan. 9, 2008). When construed in the light most favorable to Zaccari, the earliest effective date could have been would be when he acknowledged the PIIA.

## IV.    THE DISTRICT COURT ERRED IN ITS BREACH ANALYSIS.

At summary judgment, the District Court opined that Zaccari had breached the Contract under "three provisions"—Contract Sections 1.1, 2.8, and 7. 7JA1800-1808 (Dkt. 65 at 17-25); 7JA1811 (Dkt. 65 at 28) ("[T]he Court concludes that Apprio's uncontroverted evidence establishes that there is no genuine dispute of material fact that Zaccari breached Sections 1.1, 7, and 2.8 of the PIIA.").

Critically, the District Court's breach-of-contract analysis was expressly predicated upon what it had already decided in its earlier order on partial summary judgment.  7JA1800 (Dkt. 65 at 17) ("[T]he Court has already determined that the PIIA constituted a valid and enforceable agreement between Zaccari and Apprio, and that, pursuant to the PIIA, Zaccari assigned to Apprio any rights he had in the CRR Software.").

Therefore, if this Court reverses on contract interpretation, <u>see</u> Section I, *supra*, on contract formation, <u>see</u> Section II, *supra*, or on a signed-writing requirement, <u>see</u> Section III, *supra*, then this Court should also reverse (or vacate) the District Court's breach-of-contract analysis.  The underlying premise would no longer hold.  And, in that sense, the issues decided at partial summary judgment and briefed above are threshold issues to a breach analysis.

Yet, *even if* this Court affirmed on these other grounds, the District Court still erred in its breach-of-contract analysis. That's because, *even assuming* arguendo *that the software copyrights were assigned to Apprio*, Zaccari did *not* breach the Contract for three reasons:

1. Providing a single deposit copy of an unpublished work to the Copyright Office did not breach Contract *Section 1.1* under any reasonable reading of that provision.

2. Refusing to sign away further rights when Apprio requested a unilateral waiver of them (*i.e.*, moral rights) did not breach Contract *Section 2.8* because the Contract doesn't govern moral rights.

3. Merely retaining documents and materials already owned and possessed by Zaccari didn't breach any obligation to "RETURN" them under *Contract Section 7*.

Each point favors Zaccari objectively—or at least on ambiguity resolved in Zaccari's favor. [8]

---

[8] In the alternative, the relevant provisions—Contract Sections 1.1, 2.8, and 7—are ambiguous, see Section I.C (contractual ambiguity when fairly susceptible to a reading), and that ambiguity should be resolved in Mr. Zaccari's favor, see Section I.D (*contra proferentem*).

*First*, the District Court erred in holding that that Zaccari breached Contract Section 1.1.

*Even* assuming *arguendo* that the Contract was valid, enforceable, and assigned Zaccari's copyrights, he still did *not* breach Contract Section 1.1.  That's because, Zaccari's deposit of a single deposit copy of the work to the U.S. Copyright Office did not breach Contract Section 1.1's prohibition on public disclosures, under any reasonable reading.

In pertinent part, Contract Section 1.1 states that the signatory "will hold in the strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Propriety Information[.]"  1JA30 (Dkt. 1-5 at 2).  Indeed, Section 1.1 lists six prohibited acts:

- "strictest confidence"

- no "disclosure"

- no "use"

- not to "lecture upon"

- not to "publish"

- No "publishing or submitting for publication" without the Company's written pre-approval.

64

1JA30 (Dkt. 1-5 at 2).  Critically, these six prohibitions should be read in light of each other under the canon of *noscitur a sociis*.  Both "state and federal courts have repeatedly endorsed the application of canons of construction" like *noscitur* a sociis "to the interpretation of contracts."  <u>See</u>, <u>e.g.</u>, <u>Citizens Ins. Co. of Am. v. Thermoflex Waukegan, LLC</u>, 588 F. Supp. 3d 845, 853 n.11 (N.D. Ill. Mar. 1, 2022) (collecting cases applying *noscitur a sociis* to contract interpretation); <u>see also</u> <u>S. D. Warren Co. v. Me. Bd. of Envtl. Prot.</u>, 547 U.S. 370, 378 (2006) (noting that *noscitur a sociis* instructs that words "words grouped in a list should be given related meaning").

Accordingly, when Contract Section 1.1's listed terms—to "hold in strictest confidence" and not to "disclose, use, lecture upon or publish"—should be given related meaning.  Lectures, disclosures, and publishing are concerned with disclosures of a public nature or perhaps giving of information to commercial competitors.

Submission of a deposit to the Copyright Office doesn't fit the bill. 6JA1432 (Dkt. 59-16 at 8:page 22:8-13) (provided deposit copy).

After all, this was no public disclosure (or competitor disclosure) because the Copyright Office places strict limits on the public's ability to access and view deposit copies.

Indeed, one can "only acquire certified or uncertified replications of deposit materials upon (1) the written authorization by the copyright owner or claimant of record, (2) the written request by an attorney in connection with actual or prospective litigation, or (3) an order by a court of competent jurisdiction in connection with a case wherein the requested materials are to used as evidence." Compuware Corp. v. Serena Software Int'l, Inc., 77 F. Supp. 2d 816, 822 (E.D. Mich. Nov. 30, 1999) (citing 37 C.F.R. § 201.2(d)(2)). And, a "person cannot acquire the deposited copy of the document because it is the property of the United States." Id. (citing §704(a)).

Given these strict limitations, courts have rejected the argument that "the general public" could readily "view and duplicate the deposited materials at the Copyright Office." Id. Thus, submitting a single deposit copy to Copyright Office is not the type of public disclosure reasonably prohibited under Contract Section 1.1.

**Notably, the federal government was already in possession of the work and was already using it.**

For these resasons, Zaccari's submission to the Copyright Office was not a disclosure. It was not "the action of making new or secret information known."[9]

---

[9] Oxford Languages Definition of "disclosure"

66

The U.S. government already had it.

***Second***, the District Court also erred in holding that that Zaccari breached Contract Section 2.8.

*Even* assuming *arguendo all of* the threshold holdings below were correct, there was still no breach of Contract Section 2.8 here.  Section 2.8 states "I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee." 1JA131 (Dkt. 1-5 at 3).  Reading this provision, the District Court thought that Zaccari's refusal to execute a purported "Confirmatory Assignment of Copyright" constituted a breach.  7JA1807-1808 (Dkt. 65 at 24-25).  After all, that's what Apprio titled it.  6JA1480 (Dkt. 59-19 at 2) ("Confirmatory Assignment of Copyright").

**But, critically, this unexecuted document was *not* a confirmatory assignment.**  Rather it was an inequitable and improper attempt to *expand* the scope of Contracted beyond the its language.  That's because the purported confirmatory assignment of copyright sought to duplicitously get Mr. Zacchery to waive his moral rights.  6JA1480 (Dkt. 59-19 at 2) ("ASSIGNOR further confirms that it has waived hereby expressly waives now and in the future **any and all moral rights** in the copyrights in the Work[.]").

67

Yet nothing in Contract Section 2.8, 1JA131 (Dkt. 1-5 at 3) or any other provision in the contract, <u>see generally</u> 1JA130-133 (Dkt. 1-5), requires the waive of moral rights—<u>*let alone mentions moral rights whatsoever*</u>.  So, contrary to the falsely-titled Confirmatory Assignment of Copyright, the Contract had **<u>not</u>** waived Mr. Zacchery's moral rights and, as such, the purported assignment was an inappropriate attempt to expand rights.

Importantly, moral rights are *distinct* from copyrights, as multiple courts have reiterated:

- "Moral rights are distinct from general copyrights[.]" <u>Cohen v. G&M Realty L.P.</u>, 988 F. Supp. 2d 212, 215, (E.D.N.Y. Nov. 20, 2013).

- "[M]oral rights are distinct from the economic rights that a copyright holder possesses[.]" <u>Chen v. Cayman Arts, Inc.</u>, 2011 U.S. Dist. LEXIS 18454, *18 (S.D. Fla. Feb. 24, 2011).

- "Moral rights are distinct from economic rights, which are governed by Article 41 of Poland's Copyright Law."<u>Rudnicki v. WPNA 1490 AM</u>, 2009 U.S. Dist. LEXIS 115236, *32 (N.D.Ill. Dec. 10, 2009) (applying Polish copyright law).

Various legal regimes afford moral rights to software creators *in addition* to and distinct from copyrights.  E.g., SaikōSaibansho [Sup. Ct.] Feb. 13, 2001, 1999(Ju)955, <u>55 Minshu No.1</u> ¶ 1(1), 2 (Japan) ("moral right over the Game Software.").  Thus, when the so-called "Confirmatory Assignment of Copyright" demanded that Zaccari unilaterally waive "all moral rights" in his software, that amounted an improper attempt to get him to relinquish additional, distinct rights nowhere discussed or waived by the Contract itself under the guise of a (false) confirmatory assignment.  Section 2.8 can't be used to compel someone to waive additional, distinct rights that were not even covered by the Contract in the first place.

And, because the so-called confirmatory assignment did just that, a refusal to sign it was not—and could not be—a breach.

**<u>Third</u>**, the District Court erred in holding that Zaccari breached Contract Section 7 ("Return of Company Documents and Property").

*<u>Even assuming</u>* ***<u>arguendo</u>*** *all of* the threshold holdings to be true, there was still no breach of Contract Section 7 here.  Section 7 demands the ***<u>return</u>*** of company documents and property upon termination.  1JA132.  The District Court held that Section 7 was breached reasoning that the "Software has been deemed to be Apprio's Proprietary Information, Zaccari has in effect admitted that he retained

69

copies" after his termination and "thereby breached Section 7 of the PIAA."
7JA1806 (Dkt. 65 at 23).

Yet, the District Court's analysis overlooked a crucial distinction between
ownership in a specific tangible *copy* and ownership in an intangible work.  <u>See</u>
§202 (delineating the difference between a work and a copy and a transfer in the
two); §101 (defining "copy").

Section 202 of the Copyright Act plainly states that "ownership of a
copyright [...] **is distinct** from ownership of any material object in which the work
is embodied." §202.  And, it goes on to say "nor, in the absence of an agreement,
does transfer of ownership of a copyright [...] convey property rights in any
material object."  <u>Id.</u>  Under this well-established and longstanding work-copy
distinction between the tangible copy and the intangible work, the Contract did <u>*not*</u>
transfer property rights in particular copies, even if it, *arguendo*, transferred the
copyright (the right in intellectual property) here.  And, as a result, even if Apprio
was deemed to own the copyright by assignment, Mr. Zacchari would still retain
ownership of his specific material copy without a specific transfer of ownership in
that tangible object.  Furthermore, Section 7 of the Contract is ambiguous insofar
as Section 7 speaks of the "return" of company documents and property.
Something cannot be *returned* to one who never possessed or owned it in the first

place.    See Webster Dictionary (defining return: "to pass back to an earlier possessor").

## CONCLUSION

This Court should reverse and remand.


Date: March 3, 2023                    Respectfully submitted,

                                       */s/ Andrew Grimm*
                                       Andrew Grimm
                                       DIGITAL JUSTICE FOUNDATION
                                       15287 Pepperwood Drive
                                       Omaha, Nebraska 68154
                                       (531) 210-2381
                                       Andrew@DigitalJusticeFoundation.org

                                       *Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

This Brief contains **12,964** words, excluding the parts of the Brief exempted by court rules.

This Brief was prepared in Microsoft Word using Times New Roman 14-point font.

Date: March 3, 2023                    Respectfully submitted,

                                       */s/ Andrew Grimm*
                                       Andrew Grimm

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via submission through the CM/ECF system.

Service upon opposing counsel will be completed via the notice of docket activity sent by the CM/ECF system.

Date: March 3, 2023                    Respectfully submitted,

                                       */s/ Andrew Grimm*
                                       Andrew Grimm